**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) ) ) | |
| *Plaintiff*, | ) ) | Case No. 2:19-cv-00677 |
| v. | ) ) | |
| UTAH DEPARTMENT OF TRANSPORTATION | ) ) | |
| *Defendant*. | ) ) | |

**COMPLAINT**

The United States of America, by authority of the Attorney General of the United States and through the undersigned attorneys, acting at the request of the Administrator of the United States Environmental Protection Agency ("EPA"), files this Complaint and alleges as follows:

**NATURE OF ACTION**

1.      This is a civil action for injunctive relief and civil penalties brought against the Utah Department of Transportation ("UDOT" or "Defendant") pursuant to Sections 309(b) and (d) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. §§ 1319(b) and (d).

2.      The United States alleges that UDOT has violated and continues to violate the terms and conditions of UDOT's National Pollutant Discharge Elimination System ("NPDES") Permit issued by the State of Utah under Section 402(b) of the CWA, 33 U.S.C. § 1342(b), for discharges of stormwater from UDOT's municipal separate storm sewer system ("MS4") throughout the State of Utah.  The United States seeks injunctive relief and civil penalties.

**JURISDICTION AND VENUE**

3.     This Court has jurisdiction over the subject matter of this action and over

Defendant pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33

U.S.C. § 1319(b).

4.     Venue is proper in the District of Utah pursuant to 33 U.S.C. § 1319(b), 28 U.S.C.

§ 1391(b) and (c), and 28 U.S.C. § 1395, because (1) it is the judicial district in which UDOT,

UDOT's MS4, facilities, and stormwater conveyances are located; (2) it is the judicial district in

which UDOT does business; (3) the claims in this lawsuit arose in this District; and (4) the acts

for which Plaintiff seeks relief occurred in this District.

5.     Authority to bring this action is vested with the Attorney General of the United

States pursuant to Section 506 of the CWA, 33 U.S.C. § 1366, and 28 U.S.C. §§ 516 and 519.

6.     Notice of the commencement of this action has been provided to the State of Utah

in accordance with 33 U.S.C. § 1319(b).

**DEFENDANT**

7.     UDOT is an agency of the State of Utah and a "person" within the meaning of

Section 502(5) of the CWA, 33 U.S.C. § 1362(5).  UDOT is separately amenable to suit under

the CWA.

8.     UDOT owns, operates, and maintains a municipal separate storm water sewer

system, also commonly known as a MS4, that serves roads, streets, highways, and supporting

facilities throughout the State of Utah.

## STATUTORY AND REGULATORY BACKGROUND

### The Clean Water Act

9.      Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters, except those discharges that are in compliance with other specifically-enumerated sections of the CWA, including Section 402 of the CWA, 33 U.S.C. § 1342.

10.     Section 502(5) of the CWA defines the term "person" to include a state or political subdivision of a state.  33 U.S.C. § 1362(5).

11.     The CWA defines the term "discharge of a pollutant" to include "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).

12.     The CWA defines the term "pollutant" to include, *inter alia*, solid waste, sewage, garbage, wrecked or discarded equipment, rock, sand, cellar dirt, and industrial, municipal, and agricultural waste.  33 U.S.C. § 1362(6).

13.     The CWA defines the term "point source" to include "any discernible, confined and discrete conveyance, including but not limited to any . . . ditch, channel, tunnel, conduit, [or] discrete fissure . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

14.     The CWA defines the term "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

15.     The regulations implementing the CWA further define "waters of the United States," to include, *inter alia*, waters "which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commence" (hereinafter "traditional navigable waters") and tributaries of such waters.  40 C.F.R. § 122.2.

**Utah NPDES Program**

16.     Section 402(a) of the CWA creates the National Pollution Discharge Elimination System, commonly known as NPDES, and provides that the Administrator of the EPA, or authorized States, may issue permits which authorize the discharge of any pollutant directly into navigable waters of the United States, but only in compliance with applicable requirements of the CWA, and/or such other conditions as the Administrator determines are necessary to carry out the provisions of the CWA, 33 U.S.C. § 1342(a).

17.     A state may establish its own NPDES program and, after receiving EPA approval, issue NPDES permits.  33 U.S.C. § 1342(b).

18.     The State of Utah has been authorized to administer the NPDES program in Utah since July 7, 1987.  52 Fed. Reg. 27578-27579 (July 22, 1987).

19.     A permit issued by the Utah Department of Environmental Quality ("UDEQ") under Utah's EPA-approved NPDES program is known as an UPDES permit.

20.     When a state is authorized to administer a NPDES permit program pursuant to Section 402(b) of the Act, 33 U.S.C. § 1342(b), EPA retains concurrent authority to enforce state-issued permits.  33 U.S.C. §§ 1319, 1342(i).

**CWA Stormwater Discharge Program**

21.     Section 402(p)(2) of the CWA establishes that a discharge from a municipal separate storm sewer system (MS4) serving a population of at least 100,000 (medium and large MS4s) requires a NPDES permit issued under Section 402 of the CWA for stormwater discharges.  33 U.S.C. § 1342(p)(2); *see also* 40 C.FR. § 122.26(a).

4

22.     Regulations governing the stormwater program are set out at 40 C.F.R. parts 122, 123, and 124.  EPA's stormwater regulations, like the CWA itself, require operators of regulated MS4s to obtain a NPDES permit authorizing discharges from the MS4.  40 C.F.R. §122.26(d).

23.     A "municipal separate storm sewer system," or MS4, is defined at 40 C.F.R. §122.26(b)(18) as

> a conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels or storm drains): (i) owned or operated by a State. . . . ; (ii) designed or used for carrying stormwater; (iii) which is not part of a Publicly Owned Treatment Works. . . .

24.     A "large municipal separate storm sewer system" (Large MS4) is defined at 40 C.F.R. § 122.26(b)(4), and means in relevant part, "all municipal separate storm sewers that are . . . located in counties [with unincorporated urbanized areas with a population of 250,000 or more according to the 1990 Decennial Census] except municipal separate storm sewers that are located in the incorporated places, townships, or towns within such counties."

25.     A "medium municipal separate storm sewer system" (Medium MS4) has a similar definition to the Large MS4 definition stated in Paragraph 24, with a population threshold of 100,000.  40 C.F.R. § 122.26(b)(7).

26.     "[S]mall municipal separate storm sewer systems" (Small MS4s) are defined at 40 C.F.R. § 122.26(b)(16) as all separate storm sewers that are:

> [o]wned or operated by the United States, a State, city, town, borough . . . or other public body (created by or pursuant to State law) having jurisdiction over disposal of . . . stormwater. . . . [;] (ii) [n]ot defined as "large or medium" municipal separate storm sewer systems[;] [and] [iii] . . . includes systems similar to separate storm sewer systems in municipalities, such as systems at military bases, large hospital or prison complexes, and highways and other thoroughfares.

27.     Pursuant to Section 402(p)(6) of the CWA, EPA promulgated regulations providing that discharges from small municipal separate storm sewer systems are regulated if they are located within an urbanized area, as defined by the latest Decennial Census.  40 C.F.R. §122.32(a)(1).

28.     The CWA provides that all permits for discharges from MS4s "shall require controls to reduce the discharge of pollutants to the maximum extent practicable, including management practices, control techniques and system, design and engineering methods, and such other provisions as the [EPA] or the State determines appropriate for control of such pollutants."  33 U.S.C. § 1342(p)(3)(B)(iii).

29.     Applicants for NPDES permits for stormwater discharges from MS4s propose a Stormwater Management Program ("SWMP") designed "to reduce the discharge of pollutants to the maximum extent practicable."  40 C.F.R. § 122.26(d)(2)(iv).

30.     Best Management Practices ("BMPs") are "schedules of activities, prohibition of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of 'waters of the United States.'  BMPs also include treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage."  40 C.F.R.  § 122.2.

**UDOT's MS4 Permit**

31.     UDOT obtained a statewide NPDES permit for its MS4 in order to comply with the requirement in 33 U.S.C. § 1342(p) and 40 C.F.R. § 122.26(a) that stormwater discharges from regulated MS4s must be authorized by a NPDES permit.

32.     UDEQ issued UDOT an UPDES Permit, No. UTS000003, on December 1, 2003 ("2003 MS4 Permit"), "to discharge, in accordance with monitoring requirements, and other

provision[s] as set forth in this permit, from all portions of municipal separate storm sewer systems owned and operated by the Utah Department of Transportation Statewide, to waters of the State."

33.    UDOT's 2003 MS4 Permit was administratively extended pursuant to UTAH ADMIN CODE r. 317-8-3.1(4)(d), and remained in effect until December 3, 2015, when UDEQ issued UDOT a renewed UPDES Permit, No. UTS000003, effective December 3, 2015 ("2015 MS4 Permit").

34.    The 2015 MS4 Permit is more detailed than the 2003 MS4 Permit, and contains additional stormwater compliance requirements that UDOT must implement.

35.    Part I of UDOT's 2003 MS4 Permit authorizes the discharge of stormwater, and specified types of non-stormwater, "to the waters of the State from all existing outfalls of the drainage system operated by [UDOT] Statewide.  The discharge of storm water from new drainage system outfalls operated by UDOT is authorized only if installation and operation are in accordance with the requirements of this permit."  2003 MS4 Permit Part I.B.1; *see also* 2015 MS4 Permit Part 1.1.

*Stormwater Management Program (SWMP) (2003 MS4 Permit Part II)*

36.    <u>SWMP</u>.  Part II of UDOT's 2003 MS4 Permit required UDOT "to develop and implement a storm water management program [SWMP] that is designed to limit, to the maximum extent practicable (MEP), the discharge of pollutants from their MS4 of their legal jurisdiction." 2003 MS4 Permit Part II; *see also* 2015 MS4 Permit Part 4.0 (requiring UDOT "to implement a storm water management program designed to reduce the discharge of pollutants from the MS4, meet the requirements of the [2015 MS4 Permit], and protect water quality").

37.     Maximum Extent Practicable ("MEP") means "the technology-based discharge standard for Municipal Separate Storm Sewer Systems established by the CWA."  2003 MS4 Permit Part I.A.16.

38.     The 2015 MS4 Permit specifies that the requirement in the 2003 MS4 Permit to develop, implement, and enforce a SWMP is valid and binding under the 2015 MS4 Permit and that UDOT is required to implement a SWMP "designed to reduce the discharge of pollutants from the MS4, meet the requirements of this Permit, and protect water quality."  2015 MS4 Permit Part 4.0.

39.     <u>SWMP Required Control Measures</u>.  The SWMP must include a section to address six minimum control measures.  "The SWMP developed by UDOT shall include BMPs that address each of these control measures Statewide (Phase I areas, Phase II areas, and all region areas outside)."  2003 MS4 Permit Part II.F.  In the event that UDOT "feels that a BMP or control measure is not applicable in their case, UDOT must so state in their SWMP along with the reason(s) it does not apply."  *Id.*  The 2003 MS4 Permit sets out detailed requirements for each of the six minimum control measures listed below:

1.  Public Education and Outreach

2.  Public Involvement/Participation

3.  Illicit Discharge Detection and Elimination

4.  Construction Site Storm Water Runoff Control

5.  Post-Construction Storm Water Management in New Development and Redevelopment

6.  Pollution Prevention/Good Housekeeping for Municipal Operations.

2003 MS4 Permit Part II.F; *see also* 2015 MS4 Permit Part 4.2.

8

40.     UDOT uses Storm Water Pollution Prevention Plans ("SWPPPs") with site maps at its maintenance stations and similar facilities to direct the implementation of the Pollution Prevention/Good Housekeeping for Municipal Operations minimum control measures referenced in Paragraph 39.

41.     <u>SWMP Violations</u>.  When UDOT fails to act in accordance with its SWMP, UDOT is in violation of its Permit because UDOT is not operating in compliance with all conditions of the Permit.  2003 MS4 Permit Part IV.A; 2003 MS4 Permit Part II and Part II.A; *see also* 2015 MS4 Permit Part 6.1.

*Self-Monitoring Requirements (2003 MS4 Permit Part III)*

42.     <u>Wet Weather Monitoring</u>.  UDOT's 2003 MS4 Permit required UDOT to implement "a wet weather monitoring program within the Phase I area (*i.e.*, the areas of Salt Lake County and Salt Lake City, meeting a population equivalent of 100,000 people or greater and a population density of 1,000 people per square mile as per 1990 census data)."  2003 MS4 Permit Part III.B; *see also* 2015 MS4 Permit Part 5.2.1.

43.     UDOT's wet weather monitoring must meet some or all of the objectives enumerated in the 2003 MS4 Permit, which include providing information and/or data to, *inter alia*, (1) "assess storm water impacts to . . . stream water quality, habitat, and biology," (2) "estimate annual cumulative pollutant loadings from the MS4," (3) "estimate mean concentrations and pollutants in discharges from major outfalls," (4) "identify and prioritize portions of the MS4 requiring additional controls," and (5) "identify water quality improvements or degradation."  2003 MS4 Permit Part III.B.1.

44.     UDOT's 2003 MS4 Permit required UDOT to select at least one wet weather monitoring location.  The selected location was required to characterize the purposes of the objectives listed in Paragraph 43 and represent UDOT's Phase I discharge area.  2003 MS4 Permit Part III.B.2; *see also* 2015 MS4 Permit Part 5.2.2.4 (requiring UDOT to select at least 4 monitoring locations in a minimum of two of UDOT's four Regions); 2015 MS4 Permit Part 5.2.2 (requiring UDOT to monitor representative outfalls and/or stream monitoring locations to characterize the quality of storm water discharges from representative roads, highways, and maintenance facilities).

45.     The minimum monitoring for each year "shall be a planned wet weather monitoring frequency of twice a year, subject to the occurrence of appropriate storm events."  2003 MS4 Permit Part III.B.5; *see also* 2015 MS4 Permit Part 5.2.2.1.

46.     <u>Dry Weather Monitoring</u>.  UDOT's 2003 MS4 Permit required UDOT to "continue ongoing efforts to detect the presence of illicit connections and improper discharges to the MS4.  All MS4 outfalls must be screened at least once during the permit term."  2003 MS4 Permit Part III.C; *see also* 2015 MS4 Permit Part 5.2.4.

47.     Although dry weather screening methodology and procedures may be modified based on actual field screening activities and need not conform to the protocol at 40 C.F.R. § 122.26(d)(1)(iv)(D), the methodology and procedures used to perform dry weather screening must be included in the SWMP.  2003 MS4 Permit Part III.C.2; *see also* 2015 MS4 Permit Part 5.2.4.1.

### CWA Enforcement Authority

48.     Section 309(b) of the CWA, 33 U.S.C. § 1319(b), authorizes the commencement of a civil action for appropriate relief, including a permanent or temporary injunction, against any person who violates Section 301(a) of the Act, 33 U.S.C. § 1311(a), or a permit condition or limitation in a

permit issued by EPA or a state under an approved permit program pursuant to Section 402 of the Act, 33 U.S.C. § 1342; *see also* 33 U.S.C. § 1319(a)(1).

49.     Section 309(d) of the CWA, 33 U.S.C. § 1319(d), and 40 C.F.R. § 19.4 establish maximum civil penalties for violations of the CWA, including violations of any condition or limitation in a permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.  The maximum civil penalty per day per violation of the CWA is $37,500 for violations occurring after November 2, 2015, and effective February 6, 2019, $51,570 per day per violation of the CWA for violations occurring after January 15, 2015; $52,414 per day per violation of the CWA for violations occurring after January 15, 2017; $53,484 per day per violation for violations occurring after January 15, 2018; and $54,833 per day per violation for violations occurring after February 6, 2019.  *See* 40 C.F.R. § 19.4 (Table 2).

## GENERAL ALLEGATIONS

50.     UDOT maintains over 6,000 miles of highways.

51.     UDOT is divided into four regional offices.

52.     Personnel in each UDOT region oversee administration, construction, and maintenance of all state roads, highways, and freeways within their areas.

53.     UDOT owns, operates, and maintains roadways, streets, and highways throughout the State of Utah.  UDOT also owns, operates, and maintains a municipal separate storm water sewer system that serves roads, streets, and highways throughout the State of Utah.

54.     UDOT's roadways throughout the State of Utah are "municipal separate storm sewer systems" within the meaning of 40 C.F.R. § 122.26(b)(18), and UDOT is required to obtain and comply with a MS4 permit for the discharge of stormwater from such roadways.

55.     The streets and separate stormwater sewer system identified in Paragraph 54 are a MS4 within the meaning of 40 C.F.R. §122.26(b)(19).

56.     UDOT's statewide MS4 includes areas meeting the definition of large, medium, and small MS4.

57.     Stormwater discharges from UDOT's MS4 through a system of pipes and ditches.

58.     The pipes and ditches identified in Paragraph 57 are "point sources" as defined by Section 507(14) of the CWA, 33 U.S.C. § 1362(14).

59.     Stormwater discharges from UDOT's MS4 contain "pollutants" within the meaning of Section 502(6) of the CWA, 33 U.S.C. § 1362(6), including but not limited to sediment, oils, metals, and nutrients.

60.     Stormwater discharges from UDOT's MS4 into the Weber River, Logan River, Jordan River, and Santa Clara River, among others.  These water bodies are "navigable waters" within the meaning of Section 502(7) of the CWA, 33 U.S.C. § 1362(7), and "waters of the United States" as defined by the regulations at 40 C.F.R. § 122.2.

61.     The Weber River, Jordan River, and Logan River are relatively permanent tributaries of Great Salt Lake, which is a traditionally navigable water, and therefore "navigable water[s]" and "waters of the United States" under 33 U.S.C. § 1362(7) and 40 C.F.R. § 122.2.  The Santa Clara River is a relatively permanent tributary of the Virgin River, which is a traditionally navigable water, and therefore a "navigable water" and a "water[] of the United States" under 33. U.S.C. § 1362(7) and 40 C.F.R. § 122.2.

62.   The Weber River, Jordan River, Santa Clara River, and other waters receiving stormwater discharges from UDOT's MS4 are impaired by pollutants and have been listed as impaired by Utah pursuant to 303(d) of the CWA, 33 U.S.C. § 1313(d).

63.   Discharges from UDOT's MS4 constitute the "discharge(s)" of "pollutants" from a "point source" to "navigable waters" within the meaning of Sections 502(12), (6), (14), and (7) of the CWA, 33 U.S.C. § 1362(12), (6), (14), and (7).

64.   Until December 2016, UDOT's SWMP was entitled "September 2011 UPDES Phase II SWMP."

65.   Part 4.1.1 of UDOT's 2015 MS4 Permit required UDOT "to submit a revised draft SWMP document to the Division within 180 days of the effective date of the Permit.  A final version of the SWMP shall be submitted to the Division as well as posted on [UDOT's] website."

66.   In December 2016, UDOT posted an updated SWMP on its website.

67.   On March 5-9, 2012, EPA conducted an inspection of Salt Lake County's MS4 (hereinafter "Salt Lake County Inspection").

68.   On June 17-21, 2013, EPA and UDEQ conducted a joint inspection of UDOT's MS4 (hereinafter "2013 inspection").  The 2013 inspection included interviewing personnel, reviewing records, as well as visiting UDOT maintenance facilities, sites with ongoing construction, and recently constructed detention ponds.

69.   On March 10, 2014, EPA issued each of UDOT's four regional offices a request for information pursuant to Section 308 of the CWA, 33 U.S.C. § 1318.

70.   On May 8, 2014, each of UDOT's four regional offices submitted a response to EPA's Section 308 Information Requests.

13

## FIRST CLAIM FOR RELIEF
### (Wet Weather Monitoring Violations)

71.     The allegations of the foregoing Paragraphs are incorporated herein by reference

72.     UDOT's 2003 MS4 Permit required UDOT to conduct wet weather monitoring in "areas of Salt Lake County and Salt Lake City meeting a population equivalent of 100,000 people or greater and a population density of 1,000 people per square mile as per the 1990 census."  2003 MS4 Permit Part III.B.

73.     UDOT's 2003 MS4 Permit specifies that the minimum wet weather monitoring for each year "shall be a planned wet weather monitoring frequency of twice a year, subject to the occurrence of appropriate storm events."  2003 MS4 Permit Part III.B.5; *see also* 2015 MS4 Permit Part 5.2.2.1.

74.     UDOT's 2003 MS4 Permit specifies that UDOT must select at least one monitoring location.  The location should, among other things, be representative of UDOT's Phase I discharge area.  2003 MS4 Permit. Part III.B.2; *see also* 2015 MS4 Permit Part 5.2.2.4 (requiring UDOT to select at least 4 monitoring locations in a minimum of two of UDOT's four Regions).

75.     UDOT's 2003 MS4 Permit required sampling and measurements taken for the purpose of monitoring to be representative of the monitored activity.  2003 MS4 Permit Part IV.S.1; *see also* 2015 MS4 Permit Part 5.2.2 (requiring UDOT to monitor representative outfalls and/or stream monitoring locations to characterize the quality of storm water discharges from representative roads, highways, and maintenance facilities).

76.     Until December 2016, UDOT had an agreement with Salt Lake County (UPDES Municipal Storm Water Discharge Permit No. UTS00001) to perform the required wet weather monitoring in accordance with Part III.B of UDOT's 2003 MS4 Permit.

77.     As part of this agreement, wet weather sampling activities were performed by Salt Lake County personnel.

78.     The agreement required stormwater sampling at a location on the Jordan River, in the northeast corner of the Murray Parkway Golf Course, on the south side of I-215, known as "JOR 03."

79.     JOR 03 is not representative of the overall MS4 discharge area.

80.     Unlike other outfalls within the MS4, JOR 03 has a constant flow due to a large amount of groundwater infiltration.

81.     As a result of the groundwater infiltration, samples taken at JOR 03 during storm events are diluted by non-stormwater.

82.     The non-stormwater dilution of samples taken from JOR 03 means that samples taken from that location are not representative of actual concentrations of stormwater pollutants from UDOT's MS4 discharges.

83.     By sampling at JOR 03, which has a constant flow due to a large amount of groundwater infiltration, and which is not representative of the overall MS4 discharge area, UDOT violated Part III.B.2 of its 2003 MS4 Permit by sampling at a location that is not representative of the overall MS4 discharge area.

### SECOND CLAIM FOR RELIEF
### (Dry Weather Monitoring Violations)

84.     The allegations of the foregoing Paragraphs are incorporated herein by reference.

85.     UDOT's 2003 MS4 Permit required UDOT to conduct dry weather monitoring in order to "detect the presence of illicit connections and improper discharges to the MS4," and

specified that "[a]ll MS4 outfalls must be screened at least once during the permit term."  2003 MS4 Permit Part III.C.1; *see also* 2015 MS4 Permit Part 5.2.4.

86.     UDOT's 2003 MS4 Permit expired on or about December 3, 2015, when UDOT's 2015 MS4 Permit became effective.

87.     UDOT's 2016 SWMP calls for screening "major outfalls."

88.     During the permit term, UDOT screened MS4 outfalls that were at least 36 inches in diameter.

89.     As of June 2013, UDOT had screened less than one-third of the MS4 outfalls located in UDOT's urbanized areas.

90.     As of May 8, 2014, UDOT had failed to conduct any dry weather monitoring since at least 2009.

91.     Upon information and belief, UDOT did not inspect the remaining two-thirds of its MS4 outfalls between May 8, 2014, and December 3, 2015, the effective date of the 2015 MS4 Permit.

92.     UDOT violated Part III.C.1 of its 2003 MS4 Permit by failing to inspect all of the MS4 outfalls within its jurisdiction during the term of its 2003 MS4 Permit.

### THIRD CLAIM FOR RELIEF
### (Illicit Discharge Detection and Elimination Violations)

93.     The allegations of the foregoing Paragraphs are incorporated herein by reference.

94.     UDOT's 2003 MS4 Permit required UDOT to "revise and implement an ongoing program to detect and eliminate illicit discharges and improper disposal into the storm sewer."  2003 MS4 Permit Part II.F.3; *see also* 2015 MS4 Permit Part 4.2.3.

95.     UDOT's 2003 MS4 Permit required UDOT to, *inter alia*, develop a storm sewer system map showing the locations of outfalls, and the names and location of waters receiving discharges from those outfalls.  2003 MS4 Permit Part II.F.3.b; *see also* 2015 MS4 Permit Part 4.2.3.1.

96.     UDOT's 2003 MS4 Permit required UDOT to, *inter alia*, prohibit non-stormwater discharges into the MS4 and implement appropriate enforcement procedures and actions.  2003 MS4 Permit Part II.F.3.b; *see also* 2015 MS4 Permit Part 4.2.3.2 and 4.2.3.2.1.

97.     UDOT's 2003 MS4 Permit required UDOT to, *inter alia*, "[d]evelop and implement a plan to detect and address non-storm water discharges, including illegal dumping into the MS4." 2003 MS4 Permit Part II.F.3.c; *see also* 2015 MS4 Permit Part 4.2.3.2 and 4.2.3.2.1.

98.     UDOT uses maintenance facilities for salt and/or sand storage, vehicle washouts, and maintenance.

99.     The 2013 inspection revealed instances where salt and other pollutants from these facilities had flowed into various drains, curbs, gutters, and/or retention ponds.

100.     At the time of the 2013 inspection, UDOT had mapped less than one-third of its storm system outfalls within urbanized areas.

101.     Several UDOT facilities do not have a facility diagram or other indication of where the drains or conveyances at the facility are located and/or showing the directional flow of stormwater offsite via these outfalls to receiving waters.

102.     UDOT failed to develop a storm sewer system map showing the location of all outfalls and the names and locations of waters receiving discharges from those outfalls in violation of Part II.F.3.a of its 2003 MS4 Permit.

17

103.    By allowing salt and other pollutants from its facilities to flow into various drains, curbs, gutters and/or retention ponds, UDOT failed to prohibit non-storm water discharges into the MS4 in violation of Part II.F.3.b of its 2003 MS4 Permit.

104.    By failing to map the locations of all outfalls, and by allowing salt and other pollutants from its facilities to flow into various drains, curbs, gutters and/or retention ponds, UDOT failed to implement a program to detect and eliminate illicit discharges and improper disposal into its MS4 in violation of Part II.F.3.c of its 2003 MS4 Permit.

## FOURTH CLAIM FOR RELIEF
### (Construction Site Stormwater Runoff Control Violations)

105.    The allegations of the foregoing Paragraphs are incorporated herein by reference.

106.    UDOT's 2003 MS4 Permit required UDOT to implement and enforce "a program to reduce pollutants in storm water runoff to the MS4 from construction activities that result in a land disturbance of greater than or equal to one acre."  2003 MS4 Permit Part II.F.4.  Construction activity that disturbs less than one acre is also subject to this requirement if the "construction activity is part of a larger common plan that will disturb one acre or more."  *Id.*; *see also* 2015 MS4 Permit Part 4.2.4.

107.    The program referenced in Paragraph 106 must include, *inter alia*, "regulatory mechanisms . . . with requirements for construction operators to use erosion and sediment controls and maintain appropriate structural and nonstructural [BMPs] to reduce pollutants discharged to the MS4 during times of soil disturbances to the [MEP]."  The regulatory mechanisms must include a penalty system severe enough to deter non-compliance in order to enforce and ensure compliance. 2003 MS4 Permit Part II.F.4.a; *see also* 2015 MS4 Permit Part 4.2.4.1 (requiring regulatory mechanisms including "the use of erosion and sediment control practices at construction

18

sites . . . equivalent to the requirements set forth in the most current UPDES Storm Water General Permits for Construction") and 2015 MS4 Permit Part 4.2.4.2.1 (requiring standard operating procedures or similar documents including processes and sanctions "to minimize the occurrence of, and obtain compliance from violators which shall include appropriate, escalating enforcement procedures and actions").

108.    The program referenced in Paragraph 106 must include, *inter alia*, "[i]nspection of construction sites and enforcement of control measures."  2003 MS4 Permit Part II.F.4.e; *see also* 2015 MS4 Permit Part 4.2.4.4–4.2.4.4.3.

109.    The program referenced in Paragraph 106 must include, *inter alia*, "[a]ppropriate education and training materials for construction site operators."  2003 MS4 Permit Part II.F.4.f; *see also* 2015 MS4 Permit Part 4.2.4.5.

110.    As of May 8, 2014, UDOT had no documented plan for enforcing requirements for construction site operators to reduce stormwater discharges.

111.    As of May 8, 2014, UDOT had no system for tracking violations or enforcement and no consistent documentation of corrections performed in response to UDOT's inspection findings.

112.    As of May 8, 2014, a number of UDOT construction sites had no record of inspections performed by either the construction site operator or by UDOT.

113.    UDOT has a training policy which requires site operators to complete UDOT's Environmental Control Supervisor ("ECS") training.

114.    As of May 8, 2014, numerous site operators, including UDOT employees, contractors, and site inspectors, had not completed the ECS training or had expired training certifications.

115.     By failing to inspect construction sites, and by failing to maintain a system for tracking violations, enforcement and/or consistent documentation of corrections performed in response to UDOT's inspection findings, UDOT failed to implement a program with regulatory mechanisms, including requirements for construction operators to use erosion and sediment controls and maintain appropriate structural and nonstructural BMPs, to reduce pollutants discharged to the MS4 during times of soil disturbances to the MEP, in violation of Part II.F.4.a of its 2003 MS4 Permit.

116.     By failing to require site operators to complete the ECS training, or other relevant training, UDOT failed to provide "[a]ppropriate education and training materials for construction site operators" in violation of Part II.F.4.f of its 2003 MS4 Permit.

### FIFTH CLAIM FOR RELIEF
### (Post-Construction Stormwater Management in
### New Development and Redevelopment Violations)

117.     The allegations of the foregoing Paragraphs are incorporated herein by reference.

118.     UDOT's 2003 MS4 Permit required UDOT to "implement and enforce a program to address storm water runoff from new development and redevelopment projects that discharge into the drainage system" for projects that disturb one or more acre, or for projects that disturb less than one acre but are part of a greater common plan of development or sale.  2003 MS4 Permit Part II.F.5; *see also* 2015 MS4 Permit Part 4.2.5.

119.     The program referenced in Paragraph 118 must "ensure that controls are in place that will prevent or minimize water quality impacts."  2003 MS4 Permit Part II.F.5; *see also* 2015 MS4 Permit Part 4.2.5.3.

120.   The program referenced in Paragraph 118 must include, *inter alia*, "[p]olicies and contract agreements to address post construction runoff from new development and redevelopment that requires appropriate BMP's [sic] to be applied."  2003 MS4 Permit Part II.F.5.b; *see also* 2015 MS4 Permit Part 4.2.5.1.

121.   The program referenced in Paragraph 118 must include, *inter alia*, training for UDOT employees that review site plans in order for the employees "to identify and minimize the potential for storm water quality impacts resulting from site design."  2003 MS4 Permit Part II.F.5.d; *see also* 2015 Permit Part 4.2.5.6.

122.   UDOT "shall at all times properly operate and maintain all facilities and systems of treatment and control (and related appurtenances) which are installed or used by UDOT to achieve compliance with the conditions of its [MS4] permit and with the requirements of the SWMP."  2003 MS4 Permit Part IV.R; *see also* 2015 MS4 Permit Part 6.17.

123.   To implement Part II.F.5 of UDOT's MS4 Permit, UDOT's 2011 SWMP called for detention ponds and wet ponds (also known as retention ponds), among other structural BMPs, to control discharges from new development and redevelopment.

124.   The 2011 SWMP required UDOT to document the performance of detention ponds and wet ponds one year after installation, and required UDOT to develop a list of wet pond facilities for distribution to maintenance personnel.

125.   UDOT failed to perform post-construction inspections or keep an inventory of post-construction BMPs, of which detention and wet ponds are a subset, in order to demonstrate compliance with the requirements of the 2011 SWMP specified in Paragraphs 118 through 124.

126.    UDOT failed to document the performance of its detention ponds and wet ponds and to develop and distribute a list of wet pond facilities to maintenance personnel.

127.    During the 2013 inspection, inspectors observed post-construction BMPs being poorly maintained at the Charter Point Road Detention Basin.  The inspectors observed a large amount of sediment running through the Charter Point Detention Basin channel, which flowed into the Utah/Salt Lake Canal.

128.    During the 2013 inspection, inspectors observed post-construction BMPs being poorly maintained at the Willow Creek Detention Pond.  The inspectors observed excess vegetation growing inside and along the detention pond as well as debris covering the screen of the outlet structure and trash around the detention pond area.  The discharge from the pond flowed into Willow Creek.

129.    UDOT failed to develop any written policies with specific procedures for enforcing or otherwise addressing issues that UDOT identified concerning the implementation and maintenance of post-construction controls by UDOT employees, contractors, and/or other entities.

130.    UDOT's training records show that UDOT failed to provide training for employees reviewing site plans.

131.    By failing to perform post-construction inspections or keep an inventory of post-construction BMPs, document the performance of its detention ponds and wet ponds, and develop and distribute a list of wet pond facilities, UDOT failed to act in accordance with its SWMP, and failed to implement and enforce a program to address stormwater runoff from new development and redevelopment projects that discharge into the drainage system in violation of Part II.F.5 of its 2003 MS4 Permit.

132.     By failing to properly maintain post-construction BMPs as required by Part IV.R of its 2003 MS4 Permit, and by allowing discharges to nearby waters, UDOT failed to ensure that controls were in place to prevent or minimize water quality impacts in violation of Part II.F.5 of its 2003 MS4 Permit.

133.     By failing to develop any written procedures for enforcing or otherwise addressing issues that UDOT identified concerning the implementation and maintenance of post-construction controls by UDOT contractors or other entities, UDOT failed to implement policies and contract agreements to address post construction runoff from new development and redevelopment requiring appropriate BMPs to be applied in violation of Part II.F.5.b of its 2003 MS4 Permit.

134.     UDOT failed to train employees that review site plans to identify and minimize the potential for stormwater quality impacts resulting from site design in violation of Part II.F.5.d of its 2003 MS4 Permit.

## SIXTH CLAIM FOR RELIEF
### (Pollution Prevention/Good Housekeeping for Municipal Operations Violations)

135.     The allegations of the foregoing Paragraphs are incorporated herein by reference.

136.     UDOT's 2003 MS4 Permit required UDOT to "implement an operation and maintenance program over the MS4 that includes a training component and has the ultimate goal of prevention or reducing polluted runoff from municipal operations."  2003 MS4 Permit Part II.F.6; *see also* 2015 MS4 Permit Part 4.2.6.

137.     UDOT's operation and maintenance program referenced in Paragraph 136 "must include employee training to prevent and reduce storm water pollution from activities such as fleet and building maintenance, new construction and land disturbances, and storm water system maintenance."  2003 MS4 Permit Part II.F.6.

23

138.    As part of the operation and maintenance program referenced in Paragraph 136, UDOT must "[o]perate and maintain with maintenance activities, maintenance schedules, and long term inspection procedures . . . in a manner so as to reduce the discharge of pollutants to the MEP." 2003 MS4 Permit Part II.F.6.a.

139.    As part of the operation and maintenance program referenced in Paragraph 136, UDOT must employ BMPs to address "[t]raining for road crews and procedures for minimizing pollutants from such things as tack oil application, excess concrete, concrete truck washout, and proper spill clean-up procedures."  2003 MS4 Permit Part II.F.6.b.3.

140.    As part of the operation and maintenance program referenced in Paragraph 136, UDOT must employ BMPs to address "[t]he handling of salt piles and salt storage areas to eliminate salt contamination in storm water."  2003 MS4 Permit Part II.F.6.b.5.

141.    As part of the operation and maintenance program referenced in Paragraph 136, UDOT must employ BMPs to address "[p]ollution prevention measures at equipment yards and maintenance shops."  2003 MS4 Permit Part II.F.6.b.6.

142.    UDOT uses SWPPPs with site maps at its maintenance stations and similar facilities to implement the requirements referenced in Paragraphs 136 through 141.

143.    The personnel conducting the 2013 inspection visited several UDOT maintenance facilities.

144.    The 2013 inspection revealed several instances where UDOT employees were unaware of stormwater compliance requirements and there were no records of stormwater training for UDOT operations staff.

145.    The 2013 inspection revealed that four of UDOT's maintenance stations failed to keep site maps and/or SWPPPs and that many other stations had maps that lacked basic information concerning the facilities, or had SWPPPs that were merely generic templates that had been supplied to the facilities in the month preceding the inspection.

146.    The 2013 inspection documented instances in which UDOT did not implement the requirements in its maintenance facility SWPPP for grading and maintenance stations to direct runoff to a retention area rather than into ditches or streams.

147.    The 2013 inspection documented instances in which salt and brine were exposed to stormwater and were being discharged and had the potential to be discharged in the future.

148.    The 2013 inspection documented instances in which pollution prevention measures at equipment yards and maintenance shops were not implemented, resulting in discharges and the potential for future discharges from vehicle washing, equipment cleaning, and materials storage.

149.    By failing to provide training for UDOT operations staff, UDOT failed to implement an operation and maintenance program that includes employee training to prevent and reduce stormwater pollution from activities such as fleet and building maintenance, new construction and land disturbances, and storm water system maintenance, in violation of Part II.F.6 of its 2003 MS4 Permit.

150.    By failing to implement requirements in its SWPPP for grading maintenance stations to direct runoff to a retention area instead of into ditches or streams, UDOT failed to conduct its operations in a manner so as to reduce the discharge of pollutants to the MEP in violation of Part II.F.6.a.1 of its 2003 MS4 Permit.

151.    By exposing salt and brine to stormwater and allowing salt and brine to be discharged and potentially discharged in the future, UDOT failed to handle salt piles and salt storage areas to eliminate salt contamination in stormwater in violation of Part II.F.6.b.5 of its 2003 MS4 Permit.

152.    By allowing discharges and the potential for future discharge from vehicle washing, equipment cleaning, and material storage, UDOT failed to employ pollution prevention measures at equipment yards and maintenance shops in violation of Part II.F.6.b.6 of its 2003 MS4 Permit.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment against Defendant as follows:

153.    Issue an injunction pursuant to Section 309(b) of the CWA, 33 U.S.C. § 1319(b), requiring Defendant to achieve permanent and consistent compliance with the CWA, the stormwater regulations (40 C.F.R. § 122.26), and UDOT's 2015 MS4 Permit;

154.    Assess, pursuant to 33 U.S.C. § 1319(d), civil penalties against Defendant, as permitted by law;

155.    Award Plaintiff its costs and disbursements in this action; and

156.    Grant Plaintiffs such other and further relief as the Court deems appropriate.

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


 /s/Alexandra B. Sherertz
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section

Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, DC 20044
(202) 514-0414
Alexandra.Sherertz@usdoj.gov


JOHN W. HUBER
United States Attorney
United States Attorney's Office for the District of Utah

/s/ Jared C. Bennett
JARED C. BENNETT
Assistant United States Attorney



Of Counsel:

MARGARET J. LIVINGSTON
Enforcement Attorney
U.S. Environmental Protection Agency, Region 8
1595 Wynkoop Street
Denver, Colorado 80202-1129

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 23, 2019, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system and that I served the foregoing on counsel for the Utah Department of Transportation listed below by U.S. Mail and e-mail.

Renee Spooner
Assistant Attorney General
Counsel to the Utah Dept. of Transportation
4501 South 2700 West
Salt Lake City, Utah 84119

*Counsel for the Utah Department of Transportation*

/s/ Alexandra B. Sherertz
ALEXANDRA B. SHERERTZ
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 514-0414
Fax: (202) 514-0097
Alexandra.Sherertz@usdoj.gov

*Counsel for the United States*